# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 18, 2012 Session

## JAMES ALTON CAMPBELL v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Grundy County**
**No. 3972      Thomas W. Graham, Judge**

_____

**No. M2011-00434-CCA-R3-PC - Filed March 28, 2012**

_____

The petitioner, James Alton Campbell, appeals the partial denial of his petition for post-conviction relief. In this appeal, the petitioner asserts that he was denied the effective assistance of counsel at trial. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ., joined.

Paul Cross, Monteagle, Tennessee, for the appellant, James Alton Campbell.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsey Paduch Stempel, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steve Strain, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A Grundy County Circuit Court jury convicted the petitioner of aggravated assault for stabbing the victim, George Byers, Jr., following an altercation at the Monteagle Veterans of Foreign Wars ("VFW"). On direct appeal, this court summarized the relevant facts as follows:

> On Saturday, November 2, 2003, the victim, George Byers, Jr., went to the Monteagle VFW to drink and dance. The victim drank beer and visited with friends for a couple of hours before going outside for fresh air. Outside, he encountered the defendant, whom he had known for some time but had not seen

in several years. The victim explained that his family and the defendant's family "are married into each other[]." According to the victim, the defendant approached him and asked if he knew who the defendant was, and the victim replied that he did and that he "wasn't scared of him, or of his mama, or his daddy, his brothers, sisters, or none of them." At that point, the defendant stabbed the victim twice in the abdomen and ran away. The victim denied threatening the defendant and insisted that he was not armed. The victim acknowledged consuming four beers and one gin and tonic prior to the offense.

After the stabbing, the victim, who did not initially realize that he had been stabbed, experienced a great deal of pain and difficulty breathing. After an evaluation at Emerald Hodgson Hospital in Sewanee, the victim was airlifted to Erlanger Medical Center in Chattanooga. The victim required surgery followed by a nine-day hospital stay and nearly one month of bed rest.

. . . .

Julia Meeks, a friend of the defendant, testified that she went to the VFW with the defendant and others to dance. She described the victim, whom she knew as "Snowball Boy," as "pretty well lit." She explained that "[h]e was mouthy . . . cussing a lot and flirty a lot." Ms. Meeks recalled that the victim was "throwing threats toward [the defendant's wife] about [the defendant]." She stated that the victim, who was armed with a knife "like . . . you would skin a deer or something with," was standing outside when her party left the VFW. She heard the victim say in a loud, threatening manner that "he'[d] take care of [the defendant] and he's tired of the Campbells, and he'd had enough and he was going to show them." Ms. Meeks left before the stabbing.

The defendant's brother-in-law, Jimmy Dale Nolan, testified that the victim "started bad mouthing" the defendant while outside the VFW. He stated that the victim and the defendant had a "quiet conversation" during which he overheard the victim say "something about [the defendant's]

-2-

daddy." At that point, Mr. Nolan saw the victim "reach in his left pocket, look like the bulge of [a] gun in his pocket and he had a scabbard knife . . . on his right side." Mr. Nolan admitted that it was against the rules to carry weapons inside the VFW. Although he insisted that he had seen the handle of the victim's gun, he admitted that he left the scene before police arrived and never informed police that the victim had been armed. Mr. Nolan stated that he could not remember whether he had discussed the case with the defendant prior to trial because he "had a bad car wreck in 1993, and [his] memory comes and goes."

*State v. James Alton Campbell*, No. M2006-01817-CCA-R3-CD, slip op. at 1-2 (Tenn. Crim. App., Nashville, Nov. 7, 2007), *perm. app. denied* (Tenn. Apr. 14, 2008). The trial court imposed a Range III sentence of 15 years' incarceration, and this court affirmed both the conviction and accompanying sentence on direct appeal. *See id.*, slip op. at 1.

The petitioner filed a timely petition for post-conviction relief, alleging, among other things, that he was denied the effective assistance of counsel at trial because his trial counsel erroneously advised him not to testify at trial and because trial counsel waived a valid challenge to his sentence via *Blakely v. Washington*, 542 U.S. 296 (2004).

At the evidentiary hearing, the petitioner testified that he and the victim had a troubled relationship and that the victim and the victim's brothers had threatened the petitioner's life on at least two occasions prior to their exchange at the VFW. The petitioner, who was on parole at the time of the offense, testified that he had tried to avoid the victim and that he only went to the VFW on the night of the offense because his wife wanted to go. He said that the victim arrived at the VFW approximately half an hour after the petitioner and his wife arrived. He recalled that he was concerned about the victim's presence given their history, but he stayed at the establishment despite that he was worried that the victim might attack him. The petitioner testified that as he left the VFW, the victim, who had been waiting outside, approached him about "an incident about [his] brother or something," and the two men exchanged words. At that point, according to the petitioner, the victim "went for that bulk in his pocket" that the petitioner believed to be a gun, and the petitioner stabbed him. The petitioner said that although the victim did not actually possess a gun, he did brandish a "case knife" with "about a seven inch blade." He explained that he stabbed the victim because "it was a do or die situation."

The petitioner said that he testified at his parole hearing that he was not at the VFW because the terms of his release prohibited him from frequenting establishments that

served alcohol. He testified that his trial counsel advised him that the State would use the parole hearing testimony to impeach his credibility should he choose to testify at trial. The petitioner could not recall whether his counsel ever prepared him for cross-examination, but he testified that the decision whether he would testify was not made until the State rested its case. The petitioner said that he would have testified if his counsel had advised him to do so.

During cross-examination, the petitioner acknowledged that he lied at the parole hearing. He also admitted that he told the trial court during the *Momon* colloquy that he had decided not to testify and that he persisted in that decision even after the trial court warned him that "self-defense [is] much harder to make . . . out if you don't take the stand." The petitioner conceded that the trial court explained that "even though your lawyer might recommend it to you in the end you have to be the one . . . you've got to make judgment calls, and this is one of those calls." The petitioner admitted that he responded to the trial court's warnings by saying that he thought it "best for [him] not to testify."

The petitioner conceded that Mr. Nolan's trial testimony established that the victim started the heated verbal exchange, that the victim was armed with a large knife, and that it appeared as though the victim was reaching for a bulky area in his pocket when the petitioner stabbed him. The petitioner acknowledged fleeing the scene after he stabbed the victim.

The trial transcript, which was exhibited to the petitioner's testimony, established that the trial court informed the petitioner no fewer than four times that the decision whether to testify was his alone to make, regardless of the advice of his attorneys.

Sheila Nolan, the petitioner's sister, testified that she and her husband, Mr. Nolan, met the petitioner and his wife at the VFW on the night of the offense. She said that the victim arrived after they did and that he went outside approximately 45 minutes before they decided to leave. Ms. Nolan said that she witnessed the encounter between the petitioner and the victim, explaining that the victim "was hollering at" the petitioner and that the petitioner "was answering back at him" before the victim "come with a knife." She testified that she did not see the petitioner stab the victim and that she did not learn of the stabbing until after she left the VFW. Ms. Nolan said that she did not talk to police and admitted that she fled the scene following the offense.

Jeffrey Scott Schaarschmidt, a criminal defense attorney from Chattanooga, testified that in his opinion, trial counsel should have advised the petitioner to testify, explaining, "[H]e should have taken the stand if he was to have any chance that a jury would find self-defense." Mr. Schaarschmidt opined that "there's a reasonable likelihood that [the

-4-

jury] could have come back with a different verdict" had the petitioner testified.

Mr. Schaarschmidt conceded that Mr. Nolan's testimony supported the theory of the defense. He admitted that, had the petitioner chosen to testify, the State would have impeached his testimony with his criminal record, which included felony convictions for burglary, theft, and escape, and with the petitioner's inconsistent testimony at the parole hearing. Mr. Schaarschimdt acknowledged that he did not know what verdict the jury would have returned had the petitioner testified. He conceded that trial counsel correctly warned the petitioner about the potential for impeachment. He said, however, that he would have placed greater weight "on the fact that you really need to know what's going through [the petitioner's] head" and lesser weight on the potential for impeachment.

Mr. Schaarschmidt testified that the State could have presented the petitioner's parole hearing testimony regardless of whether the petitioner took the stand. He claimed the State "could have brought in whoever he made the statement to" to "put that forth" as an admission by a party opponent.

Following Mr. Schaarschmidt's testimony, the petitioner rested, and the State presented the testimony of lead trial counsel, the district public defender for Grundy County. Lead trial counsel testified that he discussed with the petitioner the advantages and disadvantages of his taking the stand as had been his "practice certainly for the last 20 plus years." Although lead trial counsel could not recall with any specificity his conversation with the petitioner, he explained that in each case he reviews with his client the strengths and weaknesses of the State's case. He did recall that at the close of the State's proof, he did not believe that the State had "made out very much of a case." Lead counsel said that he and assistant counsel had discussed the ramifications of the petitioner's parole hearing testimony prior to the trial. According to lead counsel, his most vivid memory of the petitioner's trial was the petitioner's behavior in the courtroom during voir dire. He said that the petitioner had an "unsettling" exchange with "a young lady seated on the front row . . . about a baby and bringing that baby to the courtroom."

Lead counsel testified that "it's always the client's decision" whether to testify at trial. He disagreed with Mr. Schaarschmidt's assessment that the jury would have been more likely to return a different verdict had the petitioner testified, saying, "[A]nybody who can predict a jury verdict or how 12 people are going to assess testimony is out of my league. I can't do it and I've been practicing law 37 years. I don't ever answer that question to a client, I have no clue what that jury's thinking." Lead counsel said that he felt he had made out a defense of self-defense through the testimony of the other witnesses. He said that although he could not recall the specifics of his conversation with the petitioner, he had "never . . . in 21 years as the public defender [said] you will not testify. . . . [t]his is how it

lays out, but you've got to make the call." Counsel said that he and assistant counsel were aware of the parole hearing testimony as well as the petitioner's lengthy criminal record and that "those things would be brought" to the petitioner's attention. Counsel said that the petitioner's courtroom behavior would have also played a role in his advice to the petitioner.

During cross-examination, lead counsel reiterated that he could not recall making a specific recommendation to the petitioner but said that in every case he attempts to provide the client with "the best information and assessment that [he] as a trial lawyer can give [the client] of what [he] ha[s] observed and heard in that courtroom." He said that it was his practice to take a break to discuss the potential for the client to testify following the close of the State's proof and then again at the close of any defense proof. The record in this case showed that he did, in fact, take those two breaks. Lead counsel said that "there was nothing to be gained" by the State's attempting to use the petitioner's parole hearing testimony in their case-in-chief.

Assistant trial counsel testified that it was his "best recollection" that he and lead counsel "reviewed the things that are proper to review about the previous testimony and . . . talked to [the petitioner] again about his record, his previous statements to the parole board, basically presenting the pros and cons about what he should do." Although assistant counsel could not recall whether they had made a specific recommendation to the petitioner, he said that "if [they] made a recommendation it was to not testify probably based upon his record, his previous inconsistent statements." He stated that they "had tried to present a case that showed bad blood between the parties" and that he believed that they had done so through the testimony of the witnesses for both the State and the defense.

At the conclusion of this proof, the post-conviction court concluded that trial counsel did not perform deficiently by advising the petitioner against testifying at trial. Further, the court ruled that the petitioner had failed to establish that the result would have been different had he taken the stand and that it "probably would have been a weaker case if he had taken the stand." The court concluded that "in the end" the petitioner made the decision not to testify. The post-conviction court denied post-conviction relief in the form of a new trial based upon the ineffective assistance of counsel. The court asked for further briefing on the issue whether the petitioner was entitled to limited relief based upon *Blakely* error. In its later-filed written order, the post-conviction court granted the petitioner limited relief in the form of a reduced sentence, but it denied his claims in all other respects.

In this appeal, the petitioner reiterates his claim that trial counsel performed deficiently by advising him not to testify at trial. We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the

-6-

Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Here, the petitioner complains that his trial counsel should not have advised him against taking the stand in his own defense, claiming that his testimony was crucial to establishing a viable claim of self-defense. The record establishes, however, that no matter how crucial to his defense the petitioner's testimony might have been, his taking the stand was fraught with peril. Indeed, trial counsel noted, and the post-conviction court placed special emphasis on, the petitioner's testimony at a parole board hearing that he was not present at the Monteagle VFW on the night the victim was stabbed. This testimony would surely have been used by the State to impeach the petitioner's trial testimony that he stabbed the victim in self-defense and to generally impugn the petitioner's veracity. Moreover, although the petitioner claims on appeal that the danger of the parole board testimony being

admitted into evidence existed regardless of whether the petitioner testified, the evidence was not presented in the State's case in chief, and we are unconvinced that it would have been forthcoming unless the petitioner testified. Also, because the statement is exculpatory, it is not relevant to any issue other than the petitioner's credibility. Furthermore, the length and breadth of the petitioner's criminal history could not be ignored. Had the petitioner chosen to testify, many of those convictions would have been used to further malign his credibility before the jury. Under these circumstances, trial counsel did not perform deficiently by advising the petitioner against taking the stand.

Ultimately, the decision whether to testify was the petitioner's alone, and the record establishes that the petitioner was so instructed and that he alone made that decision. That he made it upon trial counsel's advice does not necessarily make the petitioner's waiver of his right to testify involuntary. That the petitioner viewed the decision as particularly "hard" does not render the petitioner's waiver involuntary any more than Mr. Schaarschmidt's testimony that he would have advised the petitioner to testify renders trial counsel's opposite advise deficient. Indeed, the Supreme Court has recognized that "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689.

Trial counsel did not perform deficiently by advising the petitioner against taking the stand, and the record establishes that the petitioner's waiver of his right to testify was voluntary. Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE